## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

Ronald Lee Milbourn, Jr.,

        Plaintiff,

v.                                                                        Case No. 21-2471-JWL

Estes Express Lines,

        Defendant.

### <u>MEMORANDUM AND ORDER</u>

Plaintiff Ronald Lee Milbourn, Jr. filed this diversity suit against defendant Estes Express Lines asserting three claims arising out of the termination of plaintiff's employment. Specifically, plaintiff asserts state law claims of retaliatory discharge in violation of public policy, tortious interference and defamation. This matter is presently before the court on defendant's motion for summary judgment on all claims (doc. 52). As will be explained, the motion is granted.

**Facts**

The parties stipulated to more than 125 facts in the pretrial order. The court relates most of those facts here, largely verbatim. With respect to the parties' stipulations, the court emphasizes that it has left the parties' word, grammatical and stylistic choices unchanged. A handful of additional facts are included and those facts are either uncontroverted or related in the light most favorable to plaintiff as the nonmoving party.

Estes Express Lines is in the freight transportation (trucking) business.  It operates from various facilities, known as terminals, located throughout the eastern and middle United States.  One such terminal is located in Kansas City, Kansas.  Each terminal employs various workers, including linehaul drivers (drivers who transport freight between terminals), local pick-up and delivery drivers (drivers who pick up and deliver freight local to a specific terminal), dockworkers, clerical workers, supervisors and managers.

At all times pertinent to this lawsuit, the manager of the Kansas City terminal was Jared Evans. During late 2018 and through 2019, the linehaul dispatch supervisor in Kansas City was Dawn Carter.  The linehaul supervisor prior to Ms. Carter was Cristi Taggart. Mr. Evans, Ms. Carter and Ms. Taggart directly supervised plaintiff. The regional managers over the Kansas City terminal were Brad Mott (District Operations Manager), Luis Gonzalez (Regional Safety Manager), and Montell Maners (Regional Human Resources Manager).  Wayne Young was defendant's Vice President of Security.

Plaintiff was hired by Jared Evans, Montell Maners, Luis Gonzalez and Brad Mott on September 25, 2017 as a linehaul driver.  He remained in that position for 21 months until the termination of his employment on July 1, 2019.  With the exception of Dawn Carter, and up until the time he left defendant, plaintiff liked the people he worked with. Management liked him.  They would talk about personal matters on occasion.  He respected them and they respected him, and it was a good work environment.  During his 21 months with defendant, plaintiff received written disciplinary actions.  He received a formal written warning on March 4, 2019 for his belligerence and insubordination towards Ms. Carter.  A number of the written disciplinary actions involved safety-related violations.  Some of

2

plaintiff's written disciplinary actions came from Cristi Taggart, whom plaintiff believes never did anything improper to him and never harassed him—she was a professional.   He believed Ms. Carter was giving him disciplinary write-ups which constituted harassment, and yet these write-ups were the same that he had received from Ms. Taggart before. Towards the end of his employment, in the summer of 2019 right before he was terminated, plaintiff "couldn't stand" Ms. Carter.  He didn't want to deal with her.

Kim Stewart was plaintiff's girlfriend between 2017 and 2019 during which time she would often be with him at his lake house where she kept clothes.  Ms. Stewart was not affiliated with nor was she known by defendant's management prior to June 25, 2019. On Sunday, June 23, 2019, plaintiff and Ms. Stewart had an argument.  On the following Tuesday, June 25, 2019, Ms. Stewart called defendant's Kansas City terminal several times in an effort to get in touch with Dawn Carter.  She was informed that Ms. Carter worked nights and was not at the terminal.  Ms. Stewart then left voicemail messages asking Ms. Carter to call her back.  Ms. Stewart left her name and phone number.  Later, one of defendant's dispatchers sent an email to Ms. Carter telling her to call Ms. Stewart back, that she had called twice and left voicemails.  In the early afternoon of Tuesday, June 25, 2019, Ms. Stewart continued her attempts to contact someone in management with defendant.  She left a voicemail for Jared Evans to call her back.  In that voicemail, she identified herself and set forth her phone number.

The voicemail stated that she lived out in the Lake of the Ozarks and that she had information about one of defendant's employees threatening to harm Dawn Carter.  She went on to state on the voicemail that the employee making the threats was scary and she

wanted to keep her name out of it. She said that she had been trying to get a hold of Dawn Carter for a few days, but that it was important that she know the information about the employee. She ended the voicemail by stating that this was really important, "It's the God's honest truth" and pleaded that Mr. Evans not mention her name. Having received the voicemail, at 2:00 p.m. on Tuesday, June 25, 2019, Mr. Evans gathered up one of the operations managers as a witness, and returned Ms. Stewart's call.

In that call, which Mr. Evans tape recorded, Ms. Stewart gave a lengthy and detailed report. The call was not anonymous and Ms. Stewart identified herself and her relationship with plaintiff. Ms. Stewart stated the following in her call with Mr. Evans. She was nervous about the conversation. She and plaintiff had split up on that weekend because he had put his hands on her and she was upset. She stated that she was calling because of the safety of Dawn Carter. She informed Mr. Evans that plaintiff had been telling her what was going on at work with Ms. Carter and that plaintiff had offered her money "to go whip the girl's butt, Dawn." He said he would drive her and two other people down there who would do it. Plaintiff admits saying to Ms. Stewart, "Why don't you drive up there and whoop her ass. That would be the thing to do, whoop her ass. Get your sister, whatever, go get that big chick over there at QuikTrip and do it."

At the end of the conversation, Mr. Evans informed her that he would, as described by the parties, escalate the matter and that he needed her to write a detailed statement so that the matter could be investigated. Immediately after this recorded conversation, Ms. Stewart sent an email to Mr. Evans indicating how scared she was of plaintiff and pleading with him to keep the matter confidential. She confirmed that she would send the requested

statement, but indicated that she was fearful.  Later in the afternoon of June 25, at 4:52 p.m., Ms. Stewart sent yet another email to Mr. Evans.  She stated that she was working on the detailed statement but was struggling with her decision to report the matter.

Mr. Evans escalated (again, the parties' word) this information to Montell Maners in Human Resources and Wayne Young in Corporate Security.  At the direction of Mr. Young and Mr. Maners, Mr. Evans suspended plaintiff when he came to the terminal later on June 25, 2019.  Plaintiff was informed that he was suspended pending an investigation.  Five law enforcement officers were on the premises when he was suspended and he was banned from the terminal property.

On Thursday, June 27, 2019, at 8:00 a.m., Ms. Stewart sent Mr. Evans another email.  It read that on the previous Friday evening, Ms. Stewart was on the phone with plaintiff and as usual, he was "pissed off and ranting about his dispatcher Dawn at work explaining how he was fed up with that bitch causing him trouble again.  That cunt needs her fucking ass beat.  You want to help.  I will pay you.  I got two others that will go.  I'll drive us up there but we need a different vehicle so no one recognizes me, and then we will beat that fat cunt down."  Ms. Stewart stated that Ms. Carter needed to protect herself, she was in danger and that Ms. Stewart was trying to do the right thing.  She said that plaintiff never told her who the other people were.  She reminded Mr. Evans in the email that she needed to maintain her confidentiality.  She further indicated that on the day before she and plaintiff had gotten in the altercation that led to their breakup, he sent her a text message that said, "I hate my job.  I want you and some friend to beat her ass."  Ms. Stewart shared that defendant hated his job because of his perceived harassment from Ms. Carter.  She

5

later provided Mr. Evans with a copy of this text message. In his submissions, plaintiff admits to sending this text message but asserts that it was a joke.

Plaintiff admits that had he sent this text message to defendant or directly to Dawn Carter, it would be completely legitimate for the company to terminate his employment for making a threat of harm.  He admits that if defendant had corroborated and credible evidence that he made threats and solicited others to do harm to Ms. Carter, it would be reasonable and legitimate to terminate him.  Defendant sought to test the credibility and corroboration of the statements made by Ms. Stewart.  Her report was found to be credible for several reasons.  Ms. Stewart's report was very detailed.  Plaintiff's dislike for Ms. Carter had been displayed only months before when he became belligerent and insubordinate to Ms. Carter and received a formal written warning.  Moreover, this was not an anonymous call on an employee or someone who didn't follow-up as Ms. Stewart did.

Ms. Carter filed for a Protective Order on June 28, 2019.  The state court judge issued a Temporary Protective Order.  On July 10, 2019, the state court entered a Final Protective Order.  Plaintiff was restricted from being around or having any contact with Ms. Carter for a year.  He was ordered to surrender his firearms to law enforcement.

Based on the information it received from Ms. Stewart and the investigation into that report, Mr. Young and Mr. Maners decided to terminate plaintiff's employment and they directed Mr. Evans to carry out that decision.  On July 1, 2019, Plaintiff was called to the terminal by Mr. Evans and they met at 4:00 p.m.  When he came to the terminal after being suspended for a week, plaintiff stated to Mr. Evans, "I have a friend at the lake and I think she is sending you information."  Plaintiff was informed of his termination on July

6

1, 2019. He was terminated for unacceptable behavior and disruption of production. Plaintiff admits that the sole and complete reason for the investigation which led to and caused his termination was the report by Kim Stewart. He admits that in today's workplace, defendant had a significant and compelling duty to ensure that there was no workplace violence.

Plaintiff was arrested on July 1, 2019 at defendant's terminal by the Kansas City, Kansas Police. He was charged with making terroristic threats. Plaintiff admits that the police found probable cause to arrest and charge him and put out sworn affidavits regarding the same. District Attorney Mark Dupree and Assistant District Attorney Mark Brinkworth found probable cause and charged him with communicating a threat to commit violence and encouraging and requesting others to commit a felony of aggravated battery. The District Attorney's office proceeded with the prosecution for three or four months. A preliminary hearing was set for October 24, 2019. The District Attorney's office subpoenaed Kim Stewart, Dawn Carter and two police officers. Dawn Carter, along with her husband, showed up at the preliminary hearing on October 24. A second preliminary hearing was set for December 5, 2019. Ms. Stewart, Ms. Carter and the two police officers were subpoenaed. At the December 5, 2019 preliminary hearing, Dawn Carter and the two police officers appeared in court. Kim Stewart did not appear. The case was dismissed. Plaintiff admitted in his deposition that Kim Stewart had caused him to be investigated, fired and charged with a criminal felony offense.

Plaintiff made application for driver jobs with approximately 23 companies since July 1, 2019 when he left defendant. Each time he had to explain the reason he left his

7

employment with defendant and each time plaintiff conveyed the same response.  He stated "I was charged in 2019 with making terroristic threats, solicitation for hire to do bodily harm, a criminal threat.  I did not make any terroristic threats.  My case went to court.  It was third party comments.  My case was dismissed."

Additional facts will be provided as they related to the specific arguments raised by the parties in their submissions.

**Summary Judgment Standard**

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc.*, 726 F.3d at 1143 (quotation omitted). "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id.* at 1143-44.

**Retaliatory Discharge**

Plaintiff asserts that defendant terminated his employment because he objected to various safety violations over the course of his employment. The Kansas Supreme Court has recognized the tort of retaliatory discharge as a public policy exception to the employment-at-will doctrine. *See Palmer v. Brown*, 242 Kan. 893, 896 (1988). As the Court noted in *Palmer*:

> Public policy requires that citizens in a democracy be protected from reprisals for performing their civil duty of reporting infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare. Thus, we have no hesitation in holding termination of an employee in retaliation for the good faith reporting of a serious infraction of such rules, regulations, or the law by a co-worker or an employer to either company management or law enforcement officials (whistle-blowing) is an actionable tort.

*Id.* at 900. To establish this claim, a plaintiff has the burden of proving by clear and convincing evidence, under the facts of the case, that a reasonably prudent person would have concluded the plaintiff's employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; that the employer had knowledge of the plaintiff's reporting of such violation prior to discharge of the plaintiff; and that a causal connection exists between the report and the plaintiff's discharge. *Id.*; *Poull v. Affinitas Kansas, Inc.*, 2010 WL 1462763, at *7 (Kan. App. Apr. 8, 2010). If the plaintiff establishes a prima facie case, the defendant then bears the burden of producing evidence that the plaintiff was terminated for a legitimate nonretaliatory reason. The burden then shifts back to the plaintiff to show that the defendant's reasons are pretextual. *Goodman v. Wesley Medical Center, LLC*, 276 Kan. 586, 590 (2003).

Defendants move for summary judgment on this claim on the grounds that plaintiffs cannot establish a prima facie case of retaliatory discharge and, in any event, cannot establish that defendant's proffered reason for terminating plaintiff's employment is pretextual.   In support of his claim, plaintiff asserts that he objected to various safety violations over the course of his employment: (1) on two occasions, Dawn Carter assigned him to drive a truck that had been "red-tagged" or "dead-lined" for maintenance and was unsafe to operate; (2) one or more unidentified drivers vandalized plaintiff's truck by placing anti-freeze or a similar product on the steering wheel, causing injuries to his hands; (3) Dawn Carter disciplined him for not properly using the People Net system in his truck, and (4) his co-workers created an unsafe work environment by engaging in physical altercations with one another and by luring one another into safety violations.   Even viewed in the light most favorable to plaintiffs, the evidence does not support a prima facie case of retaliatory discharge with respect to any of these alleged reports.   And even if plaintiff could establish a prima facie case of retaliatory discharge, plaintiff has not come forward with a triable issue of pretext.   Summary judgment is warranted on plaintiff's retaliatory discharge claim.

*Assigned Unsafe Trucks*

Plaintiff asserts that on two occasions during the fall and winter of 2018, Ms. Carter assigned him to operate a truck that had been "dead-lined" for maintenance and was unsafe to drive.   He admits, however, that when he complained to Ms. Carter that the trucks were scheduled for service, Ms. Carter assigned him to another truck without incident.   He does

10

not contend that he complained to anyone else about being assigned to trucks that were "dead-lined" for maintenance.  In such circumstances, he cannot establish the requisite causal connection for purposes of his prima facie case because there is no evidence that these complaints to Ms. Carter had any bearing on the termination of his employment more than six months later.

Because the six-month gap between plaintiff's complaints about his assignment to dead-lined trucks is too long to support an inference of causation or retaliatory motive on its own, plaintiff must present additional evidence of circumstances that justify an inference of retaliatory motive.  *Shoemaker v. Plastic Packaging Techs., LLC*, 2019 WL 255393542, at *3-4 (Kan. Ct. App. 2019) (collecting cases).  He asserts that Ms. Carter "didn't like it" when employees complained about the condition of equipment, but he directs the court to no evidence of any negative consequences meted out by Ms. Carter in response to such complaints.  And, more importantly, he has no evidence that Ms. Carter—the only one he identifies as having knowledge of these complaints—participated in the decision to terminate his employment.  In fact, he has no evidence that the individuals who together decided to terminate his employment—Mr. Young and Mr. Maners—had any knowledge that he had complained in 2018 about being asked to drive trucks that were dead-lined for service.  *See Palmer v. Brown*, 242 Kan. 893, 900 (1988) (plaintiff must show that decisionmaker had knowledge of report prior to discharge of employee).  Lastly, plaintiff simply cannot overcome the stipulation that he made in the pretrial order, where he "admits that the sole and complete reason for the investigation which led to and caused his termination was the report by Kim Stewart."  Pretrial Order, doc. 56, ¶3(a)(xci).  By

11

admitting that Ms. Stewart's report was the sole reason for the investigation and that the investigation caused his termination, plaintiff has all but foreclosed the possibility that his complaints about being assigned to unsafe trucks led to his termination.[1]

For the foregoing reasons, plaintiff cannot establish a causal connection between his complaints about being assigned to unsafe trucks and the termination of his employment six months later.  Defendant's motion for summary judgment on this claim is granted.

*Vandalized Truck*

In the pretrial order, plaintiff alleges that he "experienced and reported" incidents in which other employees tampered with his truck by placing toxic chemicals on the steering wheel and inside the cab, causing injury to his hands.  In support of this allegation, plaintiff relies on the affidavit of a coworker, who avers that plaintiff "told [him] about the safety incidents with his truck where a co-employee or employees had got into the vehicle and placed anti-freeze or other substances on the steering wheel and cab."  Because this affidavit is clearly not based on personal knowledge, the evidence is inadmissible.  *See* Fed. R. Civ. P. 56(c)(4) (allowing for use of an affidavit to support or oppose a motion for summary judgment so long as it is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated").  And while plaintiff also directs the court to one of his interrogatory

---

[1] While the court recognizes that there might exist more than one reason for plaintiff's termination, it addresses this possibility in connection with plaintiff's pretext arguments.

responses in which he asserts that his vehicle was vandalized by his co-workers, that response does not include an assertion that he reported that conduct to anyone.[2]  Without any evidence that plaintiff actually reported this conduct, he cannot establish a prima facie case of retaliatory discharge and he cannot withstand defendant's motion for summary judgment. *See Fowler v. Criticare Home Health Services, Inc.*, 27 Kan. App. 2d 869, 876 (2000) ("A worker who wants to come under the protections of [*Palmer*] must seek out the intervention of a higher authority, either inside or outside of the company.").

*People Net System*

Plaintiff also asserts in his submissions that he reported issues relating to the "People Net" system in defendant's trucks.  The evidence demonstrates that this system—a device that is mounted in the truck—functions as a timekeeping system for defendant's drivers and also logs a driver's activities, such as pre- and post-trip inspections.  According to plaintiff, he received several disciplinary write-ups from Dawn Carter about his failure to properly log pre- and post-trip inspections in the People Net system.  Plaintiff believes that Ms. Carter was unfairly harassing him and singling him out for discipline.  He asserts that he talked to Jared Evans and Montell Maners about the warning letters and that Mr. Evans said he would "take care of it."  Notably, plaintiff has come forward with no evidence that defendant was engaged in any safety violations with respect to the People Net system.  Nor

---

[2] Of course, even if the court considered the substance of the affidavit of plaintiff's co-worker, plaintiff's claim still fails because the affidavit does not indicate that plaintiff (or anyone else for that matter) ever reported the conduct to a supervisor or law enforcement official.

has he come forward with evidence that he reported what he believed was a safety violation; rather, he contends only that he reported that Dawn Carter was "harassing" him by writing him up for his failure to log his pre-trip inspections as required by Department of Transportation regulations.  In the absence of any evidence that plaintiff reasonably believed or reported that defendant was engaged in a safety violation with respect to the People Net system,[3] summary judgment is required.

*Co-Worker Safety*

Lastly, plaintiff contends that his co-workers created an unsafe work environment by engaging in physical altercations with one another and by luring one another into safety violations (by, for example, calling or texting other drivers while those drivers were driving).  In support of this assertion, plaintiff directs the court only to the affidavit of one of his coworkers, James Upchurch.  Mr. Upchurch, however, avers only as follows:

> Prior to Lee Milbourn's termination, there were instances of drivers fighting or arguing with each other in the parking lot.  No one was terminated.

Mr. Upchurch does not indicate that plaintiff or anyone else ever reported this conduct to anyone in management or law enforcement.  Without evidence that plaintiff reported this conduct, he cannot establish a prima facie case of retaliatory discharge.  Summary

---

[3] In response to one of the written warnings he received from Ms. Carter, plaintiff wrote on the discipline form that his People Net device was not working properly but that he forgot to report that issue to Luis Gonzalez, defendant's Regional Safety Manager.  But even if a jury could construe this response as a report to Ms. Carter about a safety concern, his claim still fails because, as noted earlier, there is no evidence Ms. Carter played any part in the decision to terminate plaintiff's employment and, thus, no evidence of a causal connection between the alleged report and plaintiff's termination.

judgment is appropriate on plaintiff's retaliatory discharge claim to the extent it is based on this alleged report.  *See Fowler*, 27 Kan. App. 2d at 876 (plaintiff asserting claim of retaliatory discharge in violation of public policy must make report).

*Pretext*

As just explained, plaintiff has not come forward with evidence sufficient to establish a prima facie case of retaliatory discharge under Kansas law.  But even assuming that he had come forward with such evidence, the court would nonetheless grant summary judgment on plaintiff's retaliatory discharge claim because he has not established a triable issue of pretext.  Defendant contends that plaintiff's employment was terminated based solely on the information it received from Ms. Stewart and its subsequent conclusion that plaintiff had communicated threats to cause bodily harm to his supervisor, Ms. Carter.  Plaintiff asserts that this reason is pretextual—that defendant was "irritated" by plaintiff's "complaints and reports" and was simply waiting for an opportunity to get rid of him.  According to plaintiff, that opportunity presented itself in the form of Ms. Stewart, whom plaintiff describes as a "jilted girlfriend" who gave defendant a bogus report.

Plaintiff's arguments do not cast doubt on defendant's proffered reason for terminating plaintiff's employment.  *Debord v. Mercy Health System of Kansas, Inc.*, 737 F.3d 642, 655 (10th Cir. 2013) (a plaintiff shows pretext by presenting evidence of "weakness, implausibility, inconsistency, incoherency, or contradiction in the employer's stated reasons, such that a reasonable jury could find them unconvincing").  To begin, there is absolutely no evidence in the record that defendant did not honestly believe Ms. Stewart

when she provided information that plaintiff wanted to cause harm to Ms. Carter.  Thus, even if Ms. Stewart was not truthful in her report or was motivated by a desire for retribution, plaintiff cannot establish pretext without some evidence that defendant knew or should have known the report was suspicious.  No such evidence exists in the record. Similarly, plaintiff suggests in his submissions that his communications about harming Ms. Carter were mere jokes and that he was never serious about bringing harm to her.  Again, there is no evidence that defendant believed or had reason to believe that plaintiff was joking or believed or had reason to believe that the information relayed by Ms. Stewart was anything other than a true threat to Ms. Carter's safety.  *See Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1251 (10th Cir. 2006) (upholding district court's finding that the plaintiff could not establish pretext even if the employer's reason turned out to be false where there no evidence that the employer did not honestly believe reason; court was required to look at the facts as they appeared to the decisionmaker at the time of the decision); *Dewitt v. Southwestern Bell Tel. Co*., 845 F.3d 1299, 1307-08 (10th Cir. 2017) (evidence that employer used poor business judgment or "got it wrong" is insufficient to establish pretext; issue is whether employer honestly believed the reasons it gave for termination and acted in good faith on those beliefs).

The court also rejects plaintiff's argument that defendant was looking for an excuse to get rid of plaintiff in light of his "complaints and reports" and used Ms. Stewart's disclosures to accomplish that goal.  As an initial matter, there is little evidence in the record of "complaints and reports" made by plaintiff and certainly no evidence of a volume of complaints that might cause management to start looking for a way to get rid of him.

There is also scant evidence that the decisionmakers knew about any complaints or reports that plaintiff had raised and no evidence that anyone so much as raised an eyebrow about plaintiff's complaints.    Moreover, plaintiff has stipulated in the pretrial order that management, with the exception of Ms. Carter, liked him and respected him and that it was a good working environment.  But he cannot tie Ms. Carter to the termination decision in any respect.

In short, plaintiff's argument in support of pretext is based on conclusory allegations and wild speculation wholly unsupported by concrete evidence or specific facts probative of pretext.  Summary judgment is granted on his retaliatory discharge claim.

**Tortious Interference**

In the pretrial order, plaintiff contends that defendant tortiously interfered with his employment prospects after his termination by publicly stating its reason for terminating plaintiff's employment. Kansas law recognizes a cause of action for tortious interference with a prospective business advantage or relationship. *Turner v. Halliburton Co*., 240 Kan. 1, 12 (1986).  The requirements for this tort are (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.

*Id.* (citing *Maxwell v. Southwest Nat. Bank, Wichita, Kan.*, 593 F. Supp. 250, 253 (D. Kan. 1984)).

In his submissions, plaintiff contends that defendant interfered with his prospects for employment in two ways. First, plaintiff contends that defendant provided the information it had received from Ms. Stewart to the police, who then made that information a matter of public record in a police report. Defendant moves for summary judgment on this claim on the grounds that, among other things,[4] its communications with the police are protected by qualified privilege. Under Kansas law, a qualified or limited privilege is granted to those with a special interest or duty in the subject matter of the communication. *Turner*, 240 Kan. at 7 (citing *Redmond v. Sun Publishing Co.*, 239 Kan. 30, 36 (1986)). The availability of a limited privilege is generally restricted to those situations where public policy is deemed to favor the free exchange of information over the individual's interest in his or her good reputation. *Id.* at 7-8. The question whether or not a publication is privileged is a question of law to be determined by the court. *Id.* at 8 (citing *Munsell v. Ideal Food Stores*, 208 Kan. 909, 921 (1972)).

In *Turner*, the Kansas Supreme Court held that an employer's communications with police about an employee were subject to a qualified privilege and that the employer had a duty to cooperate with the police department's investigation of that employee for theft of

---

[4] As defendant points outs, there is also no evidence in the record that any prospective employer made any employment decision based on the contents of the police report. Rather, it is most likely that these prospective employers heard about the reason for plaintiff's termination by "word of mouth" because, as plaintiff admits, "word in the trucking industry spreads quickly." For this reason, too, summary judgment would be appropriate on plaintiff's tortious interference claim.

company tools.  240 Kan. at 11.  In this case, the court similarly concludes that the communications that defendant's management-level employees had with police about plaintiff are subject to a qualified privilege.  Defendant clearly had a duty to cooperate with the police in their investigation of plaintiff with respect to the threats he made concerning Ms. Carter.  To overcome the privilege, plaintiff must show that defendant acted with actual malice.  *Id*. at 10 (qualified privilege can be overcome only by a showing of actual malice). No evidence of malice on the part of defendant exists in the record and any finding of malice is entirely inconsistent with plaintiff's stipulations in the pretrial order.  There, he stipulated that the police found probable cause to arrest him and to charge him with making a criminal threat.  He stipulated that the District Attorney's office found probable cause to charge him with communicating a threat to commit violence and encouraging others to commit a felony of aggravated battery.  He stipulated that Ms. Stewart—not defendant— caused him to be investigated and charged with a criminal felony offense.  In light of these significant stipulations, plaintiff cannot show—and has not alleged—that defendant acted with malice in its communication with the police.   Thus, plaintiff cannot rely on defendant's communications with police to support his tortious interference claim.

The only other conduct that plaintiff relies on to support his claim is that one of his former co-workers posted plaintiff's "mug shot" on the Facebook page of LTL Carriers Group, a page that plaintiff contends is accessed by all major trucking employers and trucking employees.  But this conduct also fails to support plaintiff's claim because there is no evidence that defendant is responsible for that conduct.  It is undisputed that the Facebook page is not affiliated with or sponsored by defendant.  Plaintiff has no evidence

that defendant knew about the posting.  And while plaintiff admits that a former co-worker was responsible for the posting, he makes no effort to explain how defendant might be liable for the conduct of that employee.  Under Kansas law, defendant can be held liable for the tortious conduct of its agents only if the agents, at the time of the conduct, were acting within the scope of their authority and within the course of their employment, or in an effort to advance defendant's interests. *See Williams v. Community Drive-in Theater, Inc.*, 214 Kan. 359, 366 (1974). An employee is acting within the scope of his or her employment if the employee is performing services for which the employee has been employed or is doing anything reasonably incidental to the employment. *Commerce Bank of St. Joseph, N.A. v. State*, 251 Kan. 207, 210 (1992).  According to plaintiff, the truck driver who posted plaintiff's mug shot did so because he was "upset" that plaintiff had received his truck when they worked together.  The record is devoid of evidence from which a reasonable jury could conclude that this driver was acting within the scope of his employment or in defendant's interests when posting the information about plaintiff.

For the foregoing reasons, defendant is entitled to summary judgment on plaintiff's tortious interference claim.

**Defamation**

Lastly, plaintiff asserts a defamation claim against defendant.  While plaintiff has no evidence that defendant directly provided false or negative information about plaintiff to any prospective employers or through any third-party background reporting agencies, he asserts that defendant is liable for plaintiff's own "coerced" statements that he made to

potential employers regarding why he no longer worked for defendant.  But regardless of who communicated the allegedly defamatory words, plaintiff must prove that those words were false.  *See Hall v. Kansas Farm Bureau*, 274 Kan. 263, 276, 50 P.3d 495 (2002) ("The elements of defamation include false and defamatory words, communicated to a third person, which result in harm to the reputation of the person defamed.").  Based on plaintiff's stipulation as to what he told each and every prospective employer, he cannot establish that the words were false.  In the pretrial order, plaintiff stipulated as follows:

> As to all the jobs he applied for, those he got and those he did not get, with regard to explaining the reason he left Estes, Plaintiff states that he consistently conveyed the same response.  He stated "I was charged in 2019 with making terroristic threats, solicitation for hire to do bodily harm, a criminal threat.  I did not make any terroristic threats.  My case went to court.  It was third party comments.  My case was dismissed."

Doc. 56 ¶ 3.a.cxii.  Based on plaintiff's stipulation, he never actually told anyone he was fired, let alone that he was fired for making terroristic threats.  He told prospective employers only that he was charged with that conduct, that he denied engaging in that conduct, and that the charges were ultimately dismissed—and he admits that all of this information was true. As a matter of law, then, this claim fails.  *Ruebke v. Globe Commc'ns Corp.*, 241 Kan. 595, 598 738 P.2d (1987) ("Where the published statements are substantially true, there is no liability and a motion for summary judgment is proper.").  Summary judgment on plaintiff's defamation claim is granted.


**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 52) is granted.

**IT IS SO ORDERED.**

Dated this __11th__ day of October, 2022, at Kansas City, Kansas.

___s/ John W. Lungstrum_____
John W. Lungstrum
United States District Judge
